## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHN L. BOHRER, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>SANDRIDGE ENERGY, INC., TOM WARD, JAMES D. BENNETT, and EDDIE M. LEBLANC, )<br><br>Defendants. ) | **Case No.** `CIV-14-1239-R`<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff John L. Bohrer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SandRidge Energy, Inc., ("SandRidge" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired SandRidge securities between February 28, 2013 and November 3, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      SandRidge, together with its subsidiaries, explores and produces oil and natural gas properties primarily in the Mid-Continent region of the United States.  As of December 31, 2013, the Company had 4,388 gross producing wells; approximately 3,624,000 gross total acres under lease; and 30 rigs drilling in the Mid-Continent, as well as estimated proved reserves of 433.4 million barrels of oil equivalent.

3.      The Company is headquartered in Oklahoma City, Oklahoma, and its shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SD."

4.      Pursuant to a 30-year treating agreement (the "Treating Agreement") entered into with Occidental Petroleum Corporation ("Occidental"), the Company delivers natural gas to Occidental's carbon-dioxide ("$CO_2$") treatment plant in Pecos County, Texas (the "Century Plant"), and Occidental removes $CO_2$ from the Company's delivered natural gas production volumes. Under the Treating Agreement, the Company

is required to deliver certain minimum CO 2 volumes annually, and is required to compensate Occidental to the extent such requirements are not met.

5.      During the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) SandRidge was improperly accounting for penalties owed to Occidental under the Treating Agreement on an annual basis when it was required to do so on a quarterly basis; (2) SandRidge's quarterly and annual financial and operating results for the periods ending December 31, 2012 through June 30, 2014 were overstated and required restatement; (3) defendant Ward engaged in improper related party transactions; (4) SandRidge lacked proper internal controls over financial reporting; and (5) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

6.      On November 4, 2014, the Company filed a Form 8-K with the SEC, announcing that its previously issued financial statements should no longer be relied upon because the Company was improperly accounting for penalties under the Treating Agreement with Occidental.  Specifically, the Company stated in the Form 8-K, in part:

**Item 4.02**

**Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

As SandRidge Energy, Inc. (the "Company") has disclosed in prior filings, it is party to a 30-year treating agreement (the "Agreement") with Occidental Petroleum Corporation ("Occidental") for the removal of CO 2 from the Company's delivered natural gas production. Under the

Agreement, the Company is required to deliver to Occidental's Century Plant a total of approximately 3,200 Bcf of $CO_2$ during the term of the Agreement. Through September 30, 2014, the Company had delivered to Occidental 117 Bcf of $CO_2$. After each calendar year, the Company is obligated to pay Occidental $0.25 per Mcf (the "$0.25 Fee") to the extent minimum annual $CO_2$ volume requirements are not met. If such underdelivered volumes are not made up with commensurate overdeliveries in the future, the Company will be obligated to pay Occidental an additional $0.70 per Mcf (the "$0.70 Fee") of the aggregate underdelivered volumes in 2041.

Because the minimum $CO_2$ delivery requirements associated with the $0.25 Fee are based on annual volumes, and not quarterly volumes, the Company has historically accrued and recorded a liability for the annual $0.25 Fee in the fourth quarter of each year. Likewise, because the Company has until 2041 to make up underdelivered volumes with commensurate overdeliveries, no amount has been accrued by the Company as a liability in respect of the $0.70 Fee.

Based on this accounting treatment, the Company accrued liabilities for the $0.25 Fee of $8.5 million in 2012 and $32.7 million in 2013, which are reflected in the consolidated financial statements included in the Annual Reports on Form 10-K for such years. In addition, the Company disclosed in its Annual Report on Form 10-K for the year ended December 31, 2013 that it expected to accrue between approximately $30.0 million and $37.0 million for the $0.25 Fee during the year ending December 31, 2014 for amounts related to the Company's anticipated shortfall in meeting its annual $CO_2$ delivery obligations for 2014 under the Agreement.

The Company has recently engaged in discussions with the staff of the Division of Corporation Finance (the "Staff") of the Securities and Exchange Commission regarding the appropriate accounting treatment with respect to the timing of accrual of liabilities for the $0.25 Fee. As a result of such discussions, the Company is reconsidering its historical accounting treatment with respect to such accruals, and, in that regard, some or all of the liabilities associated with the Agreement previously recorded annually by the Company may be required to be re-recorded in one or more prior quarterly periods, which, in turn, could materially affect the net income previously reported for prior periods. The Company plans to continue to discuss with the Staff the appropriate accounting treatment with respect to the underdelivery penalties under the Agreement, and any revised accounting treatment adopted by the Company could materially affect the amount and timing of accruals with respect to such penalties. Upon

resolution of the matter with the Staff, the Company will restate, to the extent necessary, the financial statements for prior periods to make any necessary changes. In addition, the Company is reassessing its previous conclusions regarding the effectiveness of internal control over financial reporting and disclosure controls and procedures as they relate to the accounting under the Agreement.

As a result of the circumstances described above, on November 2, 2014, the Audit Committee of the Board of Directors of the Company concluded that (i) the consolidated financial statements of the Company for the periods ended December 31, 2012 and 2013 included in the Company's Annual Reports on Form 10-K for the periods then ended, with respect to which the Company received an unqualified opinion from its independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"), and (ii) the unaudited consolidated financial statements of the Company for the periods ended March 31, 2013, June 30, 2013, September 30, 2013, March 31, 2014, and June 30, 2014 included in the Company's Quarterly Reports on Form 10-Q for the periods then ended should no longer be relied upon due to potential changes related to the accrual of a liability associated with underdelivery by the Company of $CO_2$ to the Century Plant.

In connection with any restatement of the financial statements for prior periods as described above, and as a result of the resolution of other comments made by the Staff, the Company may make other changes to such financial statements; however, the Company does not anticipate that any of these other corrections would be material to the respective prior periods.

The Company is working to complete and file its Quarterly Report for the period ended September 30, 2014 as soon as possible following resolution of this matter. However, it is currently anticipated that such filing will not be timely.

SandRidge's Audit Committee has discussed the foregoing matters with PwC.

7.      As a result of this news, shares of SandRidge shares fell $0.25 or over 6.5%

on heavy volume, to close at $3.56 on November 4, 2014.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired SandRidge securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant SandRidge is a Delaware corporation with its principal executive offices located at 123 Robert S. Kerr Avenue, Oklahoma City, OK 73102. SandRidge's common stock trades on the NYSE under the ticker symbol "SD."

15.     Defendant Tom Ward ("Ward") served as the Company's Chief Executive Officer ("CEO") at all relevant times until he was fired on June 20, 2013 amidst an independent review that was investigating whether Ward engaged in improper related party transactions.

16.     Defendant James D. Bennett ("Bennett") became the Company's CEO on June 20, 2013. At all relevant times prior to June 20, 2014, Bennett was the Company's Chief Financial Officer ("CFO"), and was thereafter promoted to CEO to replace Ward.

17.     Defendant Eddie M. LeBlanc ("LeBlanc") has served as the Company's CFO since July 8, 2013.

18.     The defendants referenced above in ¶¶ 15 - 17 are sometimes referred to herein as the "Individual Defendants."

19.     Defendant SandRidge and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     SandRidge Energy, Inc. explores and produces natural gas and crude oil. The Company and its subsidiaries own and operate gas gathering, processing, carbon dioxide treating, and transportation facilities.  SandRidge Energy also conducts marketing and tertiary oil recovery operations in the United States and Gulf of Mexico.

**Materially False and Misleading**
**Statements Issued During the**
**Period**

21.     On February 28, 2013, the Company issued a press release and filed a Form

8-K with the SEC, announcing its financial and operating results for the fourth quarter

and full year ended December 31, 2012.  For the fourth quarter, the Company announced

a net loss of $287.9 million or $0.63 per share on a diluted basis, on revenue of $1.38

billion, compared to a net loss of $374.72 million, or $0.97 per share on a diluted basis,

on revenue of $357.8 million for same period in the prior year.  For the full year, the

Company reported net income of $141.57 million, or $0.19 per diluted share, on revenue

of $2.76 billion, compared to net income of $108.1 million, or $0.13 per diluted share, on

revenue of $1.36 billion for the prior year.

22.     On March 1, 2013, the Company filed a Form 10-K with the SEC which

was signed by defendants Ward and Bennett, and reiterated the Company's previously

announced quarterly and fiscal year-end financial results and financial position. In

addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of

2002 ("SOX") by defendants Ward and Bennett, stating that the financial information

contained in the Form 10-K was accurate and disclosed any material changes to the

Company's internal control over financial reporting.  In the Form 10-K, the Company

stated, in part:

> Pursuant to a 30-year treating agreement the Company entered into with
> Occidental Petroleum Corporation ("Occidental"), the Company will
> deliver natural gas to Occidental's $CO_2$ treatment plant in Pecos County,
> Texas (the "Century Plant"), and Occidental will remove $CO_2$ from the
> Company's delivered natural gas production volumes. The Company will

retain all methane gas after treatment. Under this agreement, the Company is required to deliver certain minimum $CO_2$ volumes annually, and is required to compensate Occidental to the extent such requirements are not met. The Company accrued $8.5 million at December 31, 2012 for the Company's shortfall in meeting its 2012 delivery obligation. Based upon projected natural gas production levels, the Company expects to accrue between approximately $29.5 million and $36.0 million during the year ending December 31, 2013 for amounts related to the Company's anticipated shortfall in meeting its 2013 annual delivery obligation. Due to the sensitivity of natural gas production to prevailing market prices, the Company is unable to estimate additional amounts it may be required to pay under this agreement in subsequent periods.

23.     On May 7, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing financial and operating results for the first quarter ending March 31, 2013. The Company reported a net loss of $479.34 million, or $1.03 per diluted share, on revenue of $459.61 million, compared to a net loss of $218.18 million, or $0.58 per diluted share, on revenue of $256.18 million, for the same period in the prior year.

24.     On May 8, 2013, the Company filed a Form 10-Q with the SEC which was signed by defendant Bennett, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed SOX certifications by defendants Ward and Bennett, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-Q, the Company stated, in part:

> In conjunction with the Century Plant construction agreement, the Company entered into a 30-year treating agreement with Occidental for the removal of $CO_2$ from the Company's delivered production volumes. Under the agreement, the Company is required to deliver a total of approximately

3,200 Bcf of $CO_2$ during the agreement period and is required to compensate Occidental to the extent certain minimum annual $CO_2$ volume requirements are not met. The Company expects to accrue between approximately \$29.5 million and \$36.0 million at December 31, 2013 for amounts related to the Company's anticipated shortfall in meeting its 2013 annual delivery obligations based on current projected natural gas production levels. Due to the sensitivity of natural gas production to prevailing market prices, the Company is unable to estimate additional amounts it may be required to pay under this agreement in subsequent periods; however, curtailed drilling due to continued low natural gas prices may result in additional shortfall payments in future periods.

25.     On June 19, 2013, the Company filed a Form 8-K with the SEC announcing the termination of the Company's founder and CEO, Ward.  In the 8-K, the Company stated, in part:

> The Board of Directors (the "Board") of SandRidge Energy, Inc. (the "Company"), with the unanimous vote of its independent directors, is terminating the employment of Tom L. Ward.
>
> *        *        *
>
> The Board has named James Bennett, 44, as Chief Executive Officer and President of the Company, effective June 19, 2013. Mr. Bennett has served as chief financial officer of the Company since January 2011 and was promoted to President in March 2013.

26.     As a result of this news, shares of SandRidge declined \$0.25, or roughly 5%, to close at \$4.83 on June 20, 2013.

27.     On June 25, 2013, the Company filed a Form 8-K with the SEC announcing the appointment of Eddie M. LeBlanc as the Company's new CFO effective July 8, 2013.

28.     On August 6, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing financial and operating results for the second quarter ending June 30, 2013. The Company reported a net loss of \$20.44 million, or \$0.07 per diluted share, on revenue of \$512.99 million, compared to net income of \$818.07 million, or

$1.46 per diluted share, on revenue of $567.55 million for the same period in the prior year.

29.     On August 8, 2013, the Company filed a Form 10-Q with the SEC which was signed by defendant LeBlanc, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed SOX certifications by defendants Bennett and LeBlanc, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-Q, the Company stated, in part:

> In conjunction with the Century Plant construction agreement, the Company entered into a 30-year treating agreement with Occidental for the removal of $CO_2$ from the Company's delivered production volumes of natural gas. Under the agreement, the Company must deliver a total of approximately 3,200 Bcf of $CO_2$ during the agreement period; it is expected that after 2013 approximately 3,000 Bcf of $CO_2$ will remain to be delivered. The Company pays Occidental $0.25 per Mcf to the extent minimum annual $CO_2$ volume requirements are not met, and, at the end of 2042, the Company is required to pay Occidental $0.70 per Mcf for total undelivered $CO_2$ volumes, net of any $CO_2$ delivered in excess of any given year's applicable minimum volumes. Based on current projected natural gas production levels, the Company expects to accrue between approximately $29.5 million and $36.0 million at December 31, 2013 for amounts related to the Company's anticipated shortfall in meeting its 2013 annual $CO_2$ delivery obligation. Due to the sensitivity of drilling activity to market prices for natural gas, the Company is unable to estimate additional amounts it may be required to pay under the agreement in subsequent periods; however, if natural gas prices remain low, drilling activity will likely also remain low, which would result in additional shortfall payments in future periods.

30.     On November 5, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing financial and operating results for the third quarter

ending September 30, 2013.  The Company reported a net loss of $73.19 million or $0.18 per diluted share, on revenue of $480.4 million, compared to net income of $170.42 million or $0.39 per diluted share, on revenue of $561.77 million for the same period in the prior year.

31.    On November 6, 2013, the Company filed a Form 10-Q with the SEC which was signed by defendant LeBlanc, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by defendants Bennett and LeBlanc, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-Q, the Company stated, in part:

> In conjunction with the Century Plant construction agreement, the Company entered into a 30-year treating agreement with Occidental for the removal of $CO_2$ from the Company's delivered production volumes of natural gas. Under the agreement, the Company must deliver a total of approximately 3,200 Bcf of $CO_2$ during the agreement period; it is expected that after 2013 approximately 3,000 Bcf of $CO_2$ will remain to be delivered. The Company pays Occidental $0.25 per Mcf to the extent minimum annual $CO_2$ volume requirements are not met, and, at the end of 2042, the Company is required to pay Occidental $0.70 per Mcf for total undelivered $CO_2$ volumes, net of any $CO_2$ delivered in excess of any given year's applicable minimum volumes. Based on current projected natural gas production levels, the Company expects to accrue between approximately $29.5 million and $36.0 million at December 31, 2013 for amounts related to the Company's anticipated shortfall in meeting its 2013 annual $CO_2$ delivery obligation. Due to the sensitivity of drilling activity to market prices for natural gas, the Company is unable to estimate additional amounts it may be required to pay under the agreement in subsequent periods; however, if natural gas prices remain low, drilling activity will likely also remain low, which would result in additional shortfall payments in future periods.

32.     On February 27, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2013.  For the fourth quarter, the Company reported net income of $19.08 million or $0.01 per diluted share, on revenue of $465.11 million, compared with a net loss of $287.9 million, or $0.63 per diluted share, on revenue of $1.378 billion for the fourth quarter of 2012.  For the full year ending 2012, the Company reported a net loss of $553.89 million or $1.27 per share, on revenue of $1.98 billion, compared with net income of $14.57 million or $0.19 per share, on revenue of $2.76 billion for 2012.

33.     On February 28, 2014, the Company filed a Form 10-K with the SEC which was signed by defendants Bennett and LeBlanc, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position.  In addition, the Form 10-K contained signed SOX certifications by defendants Bennett and LeBlanc, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-K, the Company stated, in part:

> In conjunction with the Century Plant construction agreement, the Company entered into a 30 -year treating agreement with Occidental for the removal of $CO_2$ from the Company's delivered production volumes of natural gas. Under the agreement, the Company is required to deliver a total of approximately 3,200 Bcf of $CO_2$ during the agreement period. At December 31, 2013, approximately 3,000 Bcf of $CO_2$ remained to be delivered. The Company is obligated to pay Occidental $0.25 per Mcf to the extent minimum annual $CO_2$ volume requirements are not met. Additionally, if $CO_2$ volumes delivered by the Company over the term of the agreement do not reach 3,200 Bcf, the Company is obligated to pay Occidental $0.70 per Mcf for such undelivered $CO_2$ volumes at the end of

the agreement term in 2042 . Based upon natural gas production levels in 2013 , the Company accrued $32.7 million for amounts related to the Company's shortfall in meeting its 2013 delivery obligations, which was included in production expenses in the accompanying consolidated statement of operations for the year ended December 31, 2013 . Based on current projected natural gas production levels, the Company expects to accrue between approximately $30.0 million and $37.0 million during the year ending December 31, 2014 for amounts related to the Company's anticipated shortfall in meeting its 2014 annual delivery obligations. Due to the sensitivity of drilling activity to market prices for natural gas, the Company is unable to estimate additional amounts it may be obligated to pay under the agreement in subsequent periods; however, if natural gas prices remain low, drilling activity will likely remain very limited, which would result in additional shortfall payments in future periods.

34.    On May 7, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing financial and operating results for the first quarter ending March 31, 2014. The Company reported a net loss of $128.02 million, or $0.29 per diluted share, on revenue of $433.06 million, compared to a net loss of $479.36 million, or $1.03 per diluted share, on revenue of $495.61 million, for the same period in the prior year.

35.    On May 8, 2014, the Company filed a Form 10-Q with the SEC which was signed by defendant LeBlanc, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed SOX certifications by defendants Bennett and LeBlanc, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-Q, the Company stated, in part:

> The Company is party to a 30-year treating agreement with Occidental Petroleum Corporation ("Occidental") for the removal of $CO_2$ from the

Company's delivered natural gas production. Under the agreement, the Company is required to deliver a total of approximately 3,200 Bcf of $CO_2$ during the agreement period. The Company is obligated to pay Occidental $0.25 per Mcf to the extent minimum annual $CO_2$ volume requirements are not met. Additionally, if $CO_2$ volumes delivered by the Company over the term of the agreement do not reach 3,200 Bcf, the Company is obligated to pay Occidental $0.70 per Mcf for such undelivered $CO_2$ volumes at the end of the agreement term in 2042. Based on current projected natural gas production levels, the Company estimates approximately 2,800 Bcf of $CO_2$ will remain to be delivered under the contract, net of any accrued annual shortfalls, as of December 31, 2014 and expects to accrue between approximately $30.0 million and $37.0 million during the year ended December 31, 2014 for amounts related to the Company's anticipated shortfall in meeting its 2014 annual delivery obligation. Due to the sensitivity of drilling activity to market prices for natural gas, the Company is unable to estimate additional amounts it may be required to pay under the agreement in subsequent periods; however, if natural gas prices remain low, drilling activity will likely remain very limited, which would result in additional shortfall payments in future periods.

36.    On August 6, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing financial and operating results for the second quarter ending June 30, 2014. The Company reported a net loss of $24.44 million, or $0.08 per diluted share, on revenue of $374.71 million, compared to a net loss of $20.44 million, or $0.07 per diluted share, on revenue of $512.99 million, for the same period in the prior year.

37.    On August 7, 2014, the Company filed a Form 10-Q with the SEC which was signed by defendant LeBlanc, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed SOX certifications by defendants Bennett and LeBlanc, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-Q, the Company stated, in part:

The Company is party to a 30-year treating agreement with Occidental Petroleum Corporation ("Occidental") for the removal of $CO_2$ from the Company's delivered natural gas production. Under the agreement, the Company is required to deliver a total of approximately 3,200 Bcf of $CO_2$ during the agreement period. The Company is obligated to pay Occidental $0.25 per Mcf to the extent minimum annual $CO_2$ volume requirements are not met. Additionally, if $CO_2$ volumes delivered by the Company over the term of the agreement do not reach 3,200 Bcf, the Company is obligated to pay Occidental $0.70 per Mcf for such undelivered $CO_2$ volumes at the end of the agreement term in 2042. Based on current projected natural gas production levels, the Company estimates approximately 2,800 Bcf of $CO_2$ will remain to be delivered under the contract, net of any accrued annual shortfalls, as of December 31, 2014 and expects to accrue between approximately $30.0 million and $37.0 million during the year ended December 31, 2014 for amounts related to the Company's anticipated shortfall in meeting its 2014 annual delivery obligation. Due to the sensitivity of drilling activity to market prices for natural gas, the Company is unable to estimate additional amounts it may be required to pay under the agreement in subsequent periods; however, if natural gas prices remain low, drilling activity will likely remain very limited, which would result in additional shortfall payments in future periods.

38.    The statements referenced in ¶¶ 21-37 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) SandRidge was improperly accounting for penalties owed to Occidental under the Treating Agreement on an annual basis when it was required to do so on a quarterly basis; (2) SandRidge's quarterly and annual financial and operating results for the periods ending December 31, 2012 through June 30, 2014 were overstated and required restatement; (3) defendant Ward engaged in improper related party transactions; (4) SandRidge lacked proper internal controls over financial reporting; and (5) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

## The Truth Emerges

39.     On November 4, 2014, the Company filed a Form 8-K with the SEC,

announcing that its previously issued financial statements should no longer be relied upon

because the Company was improperly accounting for penalties under the Treating

Agreement with Occidental.  In the Form 8-K, the Company stated, in part:

**Item 4.02**

**Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

As SandRidge Energy, Inc. (the "Company") has disclosed in prior filings, it is party to a 30-year treating agreement (the "Agreement") with Occidental Petroleum Corporation ("Occidental") for the removal of $CO_2$ from the Company's delivered natural gas production. Under the Agreement, the Company is required to deliver to Occidental's Century Plant a total of approximately 3,200 Bcf of $CO_2$ during the term of the Agreement. Through September 30, 2014, the Company had delivered to Occidental 117 Bcf of $CO_2$ . After each calendar year, the Company is obligated to pay Occidental $0.25 per Mcf (the "$0.25 Fee") to the extent minimum annual $CO_2$ volume requirements are not met. If such underdelivered volumes are not made up with commensurate overdeliveries in the future, the Company will be obligated to pay Occidental an additional $0.70 per Mcf (the "$0.70 Fee") of the aggregate underdelivered volumes in 2041.

Because the minimum $CO_2$ delivery requirements associated with the $0.25 Fee are based on annual volumes, and not quarterly volumes, the Company has historically accrued and recorded a liability for the annual $0.25 Fee in the fourth quarter of each year. Likewise, because the Company has until 2041 to make up underdelivered volumes with commensurate overdeliveries, no amount has been accrued by the Company as a liability in respect of the $0.70 Fee.

Based on this accounting treatment, the Company accrued liabilities for the $0.25 Fee of $8.5 million in 2012 and $32.7 million in 2013, which are reflected in the consolidated financial statements included in the Annual Reports on Form 10-K for such years. In addition, the Company disclosed in its Annual Report on Form 10-K for the year ended December 31, 2013 that it expected to accrue between approximately $30.0 million and $37.0

million for the $0.25 Fee during the year ending December 31, 2014 for amounts related to the Company's anticipated shortfall in meeting its annual $CO_2$ delivery obligations for 2014 under the Agreement.

The Company has recently engaged in discussions with the staff of the Division of Corporation Finance (the "Staff") of the Securities and Exchange Commission regarding the appropriate accounting treatment with respect to the timing of accrual of liabilities for the $0.25 Fee. As a result of such discussions, the Company is reconsidering its historical accounting treatment with respect to such accruals, and, in that regard, some or all of the liabilities associated with the Agreement previously recorded annually by the Company may be required to be re-recorded in one or more prior quarterly periods, which, in turn, could materially affect the net income previously reported for prior periods. The Company plans to continue to discuss with the Staff the appropriate accounting treatment with respect to the underdelivery penalties under the Agreement, and any revised accounting treatment adopted by the Company could materially affect the amount and timing of accruals with respect to such penalties. Upon resolution of the matter with the Staff, the Company will restate, to the extent necessary, the financial statements for prior periods to make any necessary changes. In addition, the Company is reassessing its previous conclusions regarding the effectiveness of internal control over financial reporting and disclosure controls and procedures as they relate to the accounting under the Agreement.

As a result of the circumstances described above, on November 2, 2014, the Audit Committee of the Board of Directors of the Company concluded that (i) the consolidated financial statements of the Company for the periods ended December 31, 2012 and 2013 included in the Company's Annual Reports on Form 10-K for the periods then ended, with respect to which the Company received an unqualified opinion from its independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"), and (ii) the unaudited consolidated financial statements of the Company for the periods ended March 31, 2013, June 30, 2013, September 30, 2013, March 31, 2014, and June 30, 2014 included in the Company's Quarterly Reports on Form 10-Q for the periods then ended should no longer be relied upon due to potential changes related to the accrual of a liability associated with underdelivery by the Company of $CO_2$ to the Century Plant.

In connection with any restatement of the financial statements for prior periods as described above, and as a result of the resolution of other comments made by the Staff, the Company may make other changes to such financial statements; however, the Company does not anticipate that

any of these other corrections would be material to the respective prior periods.

The Company is working to complete and file its Quarterly Report for the period ended September 30, 2014 as soon as possible following resolution of this matter. However, it is currently anticipated that such filing will not be timely.

SandRidge's Audit Committee has discussed the foregoing matters with PwC.

40.     As a result of this news, shares of SandRidge fell $0.25, or over 6.5%, on heavy volume, to close at $3.56 on November 4, 2014.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SandRidge securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SandRidge securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this

time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SandRidge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SandRidge;

- whether the Individual Defendants caused SandRidge to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SandRidge securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

48.      Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- SandRidge securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold SandRidge securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of

securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SandRidge securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SandRidge securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SandRidge securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SandRidge's finances and business prospects.

55. By virtue of their positions at SandRidge, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed

willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of SandRidge securities from their personal portfolios.

57. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of SandRidge, the Individual Defendants had knowledge of the details of SandRidge's internal affairs.

58. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SandRidge. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SandRidge's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SandRidge securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning SandRidge's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SandRidge securities at artificially inflated prices and relied upon the

price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.     During the Class Period, SandRidge securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SandRidge securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SandRidge securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of SandRidge securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period,

upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

62.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of SandRidge, and conducted and participated, directly and indirectly, in the conduct of SandRidge's business affairs.   Because of their senior positions, they knew the adverse non-public information about SandRidge's misstatement of income and expenses and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SandRidge's financial condition and results of operations, and to correct promptly any public statements issued by SandRidge which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SandRidge disseminated in the marketplace during the Class Period concerning SandRidge's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SandRidge to engage in the wrongful acts complained of herein. The Individual

Defendants therefore, were "controlling persons" of SandRidge within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SandRidge securities.

66. Each of the Individual Defendants, therefore, acted as a controlling person of SandRidge. By reason of their senior management positions and/or being directors of SandRidge, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SandRidge to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of SandRidge and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SandRidge.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 10, 2014                         Respectfully submitted,

                                                 s/ Michael A. Rubenstein
                                                 **RUBENSTEIN & PITTS, PLLC**
                                                 Michael A. Rubenstein
                                                 1503 E. 19th Street
                                                 Edmond, OK  73013
                                                 Telephone:  (405) 340-1900
                                                 Facsimile:  (405) 340-1001
                                                 mrubenstein@oklawpartners.com

                                                 **POMERANTZ LLP**
                                                 Jeremy A. Lieberman
                                                 Francis P. McConville
                                                 600 Third Avenue, 20th Floor
                                                 New York, New York 10016
                                                 Telephone:  (212) 661-1100
                                                 Facsimile:  (212) 661-8665
                                                 jalieberman@pomlaw.com
                                                 fmcconville@pomlaw.com

                                                 **POMERANTZ LLP**
                                                 Patrick V. Dahlstrom
                                                 10 South La Salle Street, Suite 3505
                                                 Chicago, Illinois 60603
                                                 Telephone:  (312) 377-1181
                                                 Facsimile:  (312) 377-1184
                                                 pdahlstrom@pomlaw.com

                                                 *Attorneys for Plaintiff*